IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

_____

UNITED STATES OF AMERICA,       )
           )
        Plaintiff,        )
           )
        v.        )      Civil Action No.
           )
TOLEDO REFINING COMPANY LLC,   )
           )
        Defendant.     )
_____)

## COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA" or "Plaintiff"), files this Complaint and alleges as follows:

## NATURE OF ACTION

1. This is a civil action against Toledo Refining Company LLC ("TRC") pursuant to Section 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b).

2. This Complaint is for civil penalties and injunctive relief at a petroleum refinery located in Oregon, Ohio ("Refinery" or "Toledo Refinery") for alleged violations of the following requirements and obligations:

    a. The New Source Performance Standards ("NSPS") promulgated at 40 C.F.R. Part 60, Subparts A, J, Ja, VV, VVa, GGG, and GGGa, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;

    b. The National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Benzene Waste Operations promulgated at 40 C.F.R.

Part 61, Subpart FF, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412;

c. The NESHAPs for Source Categories promulgated at 40 C.F.R. Part 63, Subparts A, CC, and UUU, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412;

d The requirements of Title V of the CAA found at 42 U.S.C. §§ 7661a(a), 7661b(c), 7661c(a), and the regulations promulgated thereunder at 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b); and

e. The portions of the Title V permit for the Toledo Refinery that adopt, incorporate, or implement the provisions cited in Subparagraphs 2.a – 2.c.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, 1355 and 1367, and Sections 113(b) of the CAA, 42 U.S.C. § 7413(b).  This Court has personal jurisdiction over TRC, which does business in the State of Ohio and in this judicial district.

4.     Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the alleged violations in this Complaint occurred and are occurring at the Toledo Refinery which is located in this District. Defendant has consented to venue in this District.

## NOTICE

5.     On February 2, 2013, EPA issued a Finding of Violation ("February 2013 FOV") identifying alleged CAA violations at the Toledo Refinery.  EPA's February 2013 FOV was sent to TRC and to the State of Ohio.  A copy is attached hereto as Exhibit 1 to this Complaint.

6.     On September 30, 2013, EPA issued a Notice and Finding of Violation ("September 2013 NOV/FOV") identifying alleged CAA violations at the Toledo Refinery.

EPA's September 2013 NOV/FOV was sent to TRC and to the State of Ohio.  A copy is attached hereto as Exhibit 2 to this Complaint.

## AUTHORITY

7.      The United States Department of Justice has authority to bring this action on behalf of EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519, and under Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

## DEFENDANT

8.      Defendant Toledo Refining Company LLC is a Delaware limited liability company doing business in the State of Ohio.  TRC is the owner and operator of the Toledo Refinery within the meaning of Sections 111(a) and 112(a) of the CAA, 42 U.S.C. §§ 7411(a) and 7412(a).

9.      TRC is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e), and applicable federal and state regulations promulgated pursuant to these statutes.

## STATUTORY AND REGULATORY BACKGROUND

I.      **CLEAN AIR ACT**

10.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

A.      **NEW SOURCE PERFORMANCE STANDARDS**

1.      **General**

11.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those

categories that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

12.     Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. §7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a New Source Performance Standard ("NSPS"). Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

13.     "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such sources.  42 U.S.C. § 7411(a)(2).  "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

14.     The New Source Performance Standards are located in Part 60 of Title 40 of the Code of Federal Regulations.

**2.     Part 60, Subpart A:  General**

15.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 ("Subpart A").

16.     Under Subpart A, the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if

earlier, the date of publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1.

17.     "Affected facility" means, with reference to a stationary source, any apparatus to which a standard is applicable."  40 C.F.R. § 60.2.

### 3.     Part 60, Subpart A:  40 C.F.R. § 60.11(d)

18.     Within Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment.  Specifically, at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.  40 C.F.R. § 60.11(d).

### 4.     Part 60, Subpart A:  40 C.F.R. § 60.18 (Requirements related to Flares Used as Control Devices)

19.     Within Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. §§ 60.18(b)–(f).

20.     Of relevance to this Complaint are the requirements that: (1) for steam-assisted flares, the net heating value of the gas being combusted must be 300 British Thermal Units ("BTU") per standard cubic foot ("scf") or greater, 40 C.F.R. § 60.18(c)(3)(ii); and (2) an owner or operator monitor each flare to ensure that it is operated and maintained in conformance with its design, 40 C.F.R. § 60.18(d).

### 5.     Specific NSPS Standards:  Part 60, Subparts J, Ja, VV, VVa, GGG, and GGGa

21.     Pursuant to Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA has identified, *inter alia*, the following as categories of stationary sources that cause, or

contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare and EPA has promulgated regulations in the following Subparts of Part 60 of Title 40 of the Code of Federal Regulations to regulate those categories:

| CATEGORY | REGULATION (40 C.F.R. Part 60) |
|---|---|
| Petroleum Refineries | Subpart J and Ja: 40 C.F.R. §§ 60.100 *et seq.* 40 C.F.R. §§ 60.100a *et seq.* |
| Equipment Leaks of VOC in Petroleum Refineries | Subpart GGG and GGGa: 40 C.F.R. §§ 60.590–60.593 40 C.F.R. §§ 60.590a–60.593a |
| Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry | Subpart VV and VVa: 40 C.F.R. §§ 60.480–60.489 40 C.F.R. §§ 60.480a–60.489a |

22.     Of relevance to this Complaint, one of the "affected facilities" that Subpart J applies to is a "fuel gas combustion device," 40 C.F.R. § 60.100(a), including a flare, 40 C.F.R. § 60.101(g), which commenced construction, reconstruction, or modification after June 11, 1973. Flares are likewise "affected facilities" under Subpart Ja.  40 C.F.R. § 60.100a(a).

23.     Under Subparts J and Ja, an owner or operator of a flare that is an affected facility is prohibited from burning any fuel gas in the flare that contains $H_2S$ in excess of 230 milligrams per dry standard cubic meter (approximately 162 ppm), unless certain exceptions apply. 40 C.F.R. §§ 60.104(a)(1), 60.103a(h).

24.     Under Subparts J and Ja, an owner or operator of a flare that is an affected facility is required to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before being burned in any flare.  40 C.F.R. §§ 60.105(a)(4), 60.107a(a)(2).

25.     Of relevance to this Complaint, the affected facilities that Subparts GGG and GGGa apply to are compressors and all "equipment" within a process unit at a petroleum

refinery. 40 C.F.R. §§ 60.590(a), 60.590a(a). "Equipment" means each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service. 40 C.F.R. §§ 60.591, 60.591a.

26. In all respects relevant to this Complaint, each owner or operator of a petroleum refinery that is subject to the requirements of Subparts GGG and GGGa is required to comply with the standards of Subparts VV and VVa, respectively. 40 C.F.R. §§ 60.592, 60.592a.

27. Of relevance to this Complaint, the affected facilities that Subparts VV and VVa apply to are all "equipment" within a process unit at a synthetic organic chemicals manufacturing facility. 40 C.F.R. §§ 60.480(a)(2), 60.482a(a)(2). "Equipment" means each pump, compressor, sampling connection system, open-ended valve or line, valve, and flange or other connector in VOC service. 40 C.F.R. §§ 60.481, 60.481a.

28. Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator who uses a flare as a control device to comply with the requirements of Subparts VV and VVa must also comply with the requirements of 40 C.F.R. § 60.18. 40 C.F.R. §§ 60.482-10(d), 60.482-10a(d).

29. Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator of any control device used to comply with the requirements of Subparts VV and VVa must monitor the control device to ensure that it is operated and maintained in conformance with its design. 40 C.F.R. §§ 60.482-10(e), 60.482-10a(e).

30. Subparts VV and VVa—and therefore, GGG and GGGa—generally require owners and operators to monitor equipment for leaks and to repair the equipment if the leaks are greater than specified regulatory thresholds.

31. With certain alternatives and exceptions not relevant here, an owner or operator subject to Subparts VV and VVa is required to monitor valves in gas/vapor and light liquid service ("valves") and pumps by the method specified in 40 C.F.R. §§ 60.485(b), 60.485a(b). 40 C.F.R. §§ 60.482-7(a)(1); 60.482-7a(a)(1); 60.482-2(a)(1); 60.482-2a(a)(1).

32. 40 C.F.R. §§ 60.485(b), 60.485a(b), in turn, require each owner or operator to comply with the monitoring procedures and requirements of Method 21 at 40 C.F.R. Part 60, Appendix A.

33. Method 21, at 40 C.F.R. Part 60, Appendix A-7, Meth. 21, Section 8.3.1, requires the owner or operator of an affected source to do as follows:

> Place the probe inlet [of the portable instrument that is capable of detecting emissions from equipment] at the surface of the component interface where leakage could occur. Move the probe along the interface periphery while observing the instrument readout. If an increased meter reading is observed, slowly sample the interface where leakage is indicated until the maximum meter reading is obtained. Leave the probe inlet at this maximum reading location for approximately two times the instrument response time. If the maximum observed meter reading is greater than the leak definition in the applicable regulation, record and report the results [as a leaking component].

34. With certain alternatives and exceptions not relevant here, under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator is required to monitor each valve on a monthly basis to detect leaks. 40 C.F.R. §§ 60.482-7(a)(1); 60.482-7a(a)(1).

35. Under Subparts VV and VVa—and therefore, under GGG and GGGa— an "open-ended valve or line" is defined as any valve, except safety relief valves, having one side of the valve seat in contact with process fluid and one side open to atmosphere, either directly or through open piping. 40 C.F.R. § 60.481.

36. With certain alternatives and exceptions not relevant here, under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator must equip each

open-ended valve or line with a cap, blind flange, plug, or second valve. 40 C.F.R.

§§ 60.482-6(a)(1); 60.482-6a(a)(1).

37.     Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator must keep a list of the identification numbers for equipment that is subject to the requirements of Subparts VV and VVa. 40 C.F.R. §§ 60.486(e)(1); 60.486a(e)(1).

38.     Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator may designate valves as "difficult to monitor," 40 C.F.R. §§ 60.486(f)(2); 60.486a(f)(2), if the equipment meets the applicable requirements to satisfy that designation. 40 C.F.R. §§ 60.482-7(h); 60.482-7a(h).

39.     Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator may delay repair of a leaking piece of equipment based on certain standards. 40 C.F.R. §§ 60.482-9; 60.482-9a. In each semi-annual report due under Subparts VV and VVa, each owner or operator must set forth the facts that explain each delay or repair and, where appropriate, why a process unit shutdown was technically infeasible. 40 C.F.R. §§ 60.487(c)(2)(vii); 60.487a(c)(2)(vii).

B.     **NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS**

1.     **General:  Section 112 prior to the 1990 CAA Amendments**

40.     Section 112 of the Clean Air Act sets forth a national program for the control of hazardous air pollutants ("HAPs"). 42 U.S.C. § 7412. As originally promulgated in the Clean Air Act Amendments of 1970, Section 112 directed EPA to publish a list of HAPs. A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 1857c-7

(1971).  At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant."  *Id.*

41.     Between 1970 and 1990, EPA listed eight substances as hazardous air pollutants and promulgated emission standards for seven of them.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 151 (1990).

### 2.     Part 61, Subpart FF:  40 C.F.R. §§ 61.340–61.359

42.     Pursuant to Section 112 as it existed prior to the CAA Amendments of 1990, EPA listed benzene as a hazardous air pollutant and promulgated standards related to the control of benzene in waste operations.  55 Fed. Reg. 8292 (March 7, 1990).  Thereafter, in 1993, EPA finalized the regulations, 58 Fed. Reg. 3072 (January 7, 1993), and published them at 40 C.F.R. Part 61, Subpart FF.  40 C.F.R. §§ 61.340-61.359.  These regulations commonly are referred to as the "Benzene Waste Operations NESHAP" or "Subpart FF."

43.     Subpart FF applies, *inter alia*, to petroleum refineries.  40 C.F.R. § 61.340(a).

44.     Under Subpart FF, the facility is required to tabulate the "total annual benzene ("TAB") content in its wastewater.  If the TAB is over 10 megagrams ("Mg"), the refinery is required to elect a control option that will require the control of all waste streams, or control of certain selected waste streams.  40 C.F.R. § 61.342.

45.     Under the control option known as the "2 Mg Option," a facility must control all benzene-containing wastes except for up to 2 Mg of aqueous benzene-containing wastes.  Under Subpart FF, at 40 C.F.R. § 61.342(c), "[e]ach owner or operator of a facility at which the total annual benzene quantity from facility waste is equal to or greater than 10 Mg/yr (11 ton/yr) . . . may elect to manage and treat the facility waste as follows:

(1)     For each waste stream that contains benzene, including (but not limited to) organic waste streams that contain less than 10 percent water and aqueous waste

streams, even if the wastes are not discharged to an individual drain system, the owner or operator shall

(i)     Remove or destroy the benzene contained in the waste using a treatment process or wastewater treatment system that complies with the standards specified in § 61.348 of this subpart.

(ii)    Comply with the standards specified in §§ 61.343 through 61.347 of this subpart for each waste management unit that receives or manages the waste stream prior to and during treatment of the waste stream in accordance with paragraph (c)(1)(i) of this section.

(iii)   Each waste management unit used to manage or treat waste streams that will be recycled to a process shall comply with the standards specified in §§ 61.343 through 61.347. Once the waste stream is recycled to a process, including to a tank used for the storage of production process feed, product, or product intermediates, unless this tank is used primarily for the storage of wastes, the material is no longer subject to paragraph (c) of this section.

(2)    A waste stream is exempt from paragraph (c)(1) of this section provided that the owner or operator demonstrates initially and, thereafter, at least once per year that the flow-weighted annual average benzene concentration for the waste stream is less than 10 ppmw as determined by the procedures specified in § 61.355(c)(2) or §61.355(c)(3).

(3)    A waste stream is exempt from paragraph (c)(1) of this section provided that the owner or operator demonstrates initially and, thereafter, at least once per year that the conditions specified in either paragraph (c)(3)(i) or (c)(3)(ii) of this section are met.

(i)     The waste stream is process wastewater that has a flow rate less than 0.02 liters per minute (0.005 gallons per minute) or an annual wastewater quantity of less than 10 Mg/yr (11 ton/yr); or

(ii)    All of the following conditions are met:

(A) The owner or operator does not choose to exempt process wastewater under paragraph (c)(3)(i) of this section,

(B) The total annual benzene quantity in all waste streams chosen for exemption in paragraph (c)(3)(ii) of this section does not exceed 2.0 Mg/yr (2.2 ton/yr) as determined in the procedures in § 61.355(j), and

(C) The total annual benzene quantity in a waste stream chosen for exemption, including process unit turnaround waste, is determined for the year in which the waste is generated.

11

46.     "40 C.F.R. § 61.05(c) prohibits any owner or operator subject to the BWON from operating an existing regulated source in violation of its requirements."

### 3.     General:  Section 112 of the CAA after the 1990 CAA Amendments

47.     Through the Clean Air Act Amendments of 1990, Congress replaced the then-existing Section 112 and established a new program for the control of HAPs.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 324 (1990).  The regulations then in existence under the original Section 112 (such as the Benzene Waste Operations NESHAP at 40 C.F.R. Part 61, Subpart FF described above) remained in full force and effect.

48.     With the 1990 amendments, Congress itself established a list of 188 hazardous air pollutants believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

49.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

50.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

51.     "Stationary source" was and is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

52.     A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed.

Reg. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id.*

53.     Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(d)(1). These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

54.     To the extent that it is not feasible to prescribe or enforce an emission standard for the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards. 42 U.S.C. § 7412(h).

55.     The emission standards promulgated under Section 112 of the 1990 Amendments of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Source Categories or "MACT" ("maximum achievable control technology") standards.  These emission standards are found in Part 63 of Title 40 of the Code of Federal Regulations.

56.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

### 4.      Part 63, Subpart A:  General

57.      Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, as it existed after the 1990 CAA Amendments, EPA promulgated regulations that contain general provisions applicable to sources that are subject to the MACT standards of Part 63 of Title 40 of the Code of Federal Regulations.  40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16 ("Subpart A").

58.      Under Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any hazardous air pollutant listed in or pursuant to section 112(b) of the Act; and (ii) is subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b).

59.      Under Subpart A, each relevant standard in Part 63 must identify explicitly whether each provision in Subpart A is or is not included in such relevant standard.  40 C.F.R. § 63.1(a)(4)(i).

### 5.      Part 63 Subpart A:  40 C.F.R. § 63.6(e)(1)(i)

60.      Within Subpart A of Part 63, EPA promulgated a requirement that corresponds to the "good air pollution control practices" requirement of Subpart A of the NSPS (*i.e.* 40 C.F.R. § 60.11(d)).  Specifically, at all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.  40 C.F.R. § 63.6(e)(1)(i).

### 6.      Part 63, Subpart A:  40 C.F.R. § 63.11(b) (Requirements related to Flares Used as Control Devices)

61.      Within Subpart A of Part 63, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. § 63.11(b).

14

62.     Of relevance to this Complaint are the requirements that: (1) for steam-assisted flares, the net heating value of the gas being combusted must be 300 British Thermal Units ("BTU") per standard cubic foot ("scf") or greater, 40 C.F.R. § 63.11(b)(6)(ii); and (2) an owner or operator monitor a flare to ensure that it is operated and maintained in conformance with its design.  40 C.F.R. § 63.11(b)(1).

### 7.     Specific MACT Standards:  Part 63, Subpart CC

63.     Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified petroleum refineries as a source category of HAPs.  57 Fed. Reg. 31576, 31591 (Table 1) (July 16, 1992).

64.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries.  60 Fed. Reg. 43260 (August 18, 1995).  These standards are commonly referred to as the "Refinery MACT" and are found at 40 C.F.R. Part 63, Subpart CC, §§ 63.640–63.656 and associated Tables.

65.     Of relevance to this Complaint, the affected sources that Subpart CC applies to are all "miscellaneous process vents" and "equipment leaks" from petroleum refining process units that are located at a plant site that is a major source and that emit or have equipment containing or contacting one or more of the HAPs listed in a table associated with Subpart CC. 40 C.F.R. §§ 63.640(c)(1), (c)(4).

66.     Under Subpart CC, owners or operators of certain types of process vents must reduce emissions of organic HAPs from these vents by using either: (1) a flare that meets the requirements of 40 C.F.R. § 63.11(b), 40 C.F.R. § 63.643(a)(1); or (2) a different type of control

device that reduces organic HAPs by 98 weight percent or to a concentration of 20 ppmv. 40 C.F.R. § 63.643(a)(2).

67.     Under Subpart CC, owners and operators must comply with the equipment leak provisions of Subpart VV, which requires compliance with 40 C.F.R. § 60.18.  40 C.F.R. § 63.648(a).

68.     Pursuant to Table 6 of Subpart CC, with certain exceptions that are not applicable here, owners or operators of affected facilities under Subpart CC are required to comply with 40 C.F.R. §§ 63.6(e) and 63.11(b).

### 8.     Specific MACT Standards:  Part 63, Subpart UUU

69.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), and several years after promulgating Subpart CC, EPA promulgated Subpart UUU:  the "National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries:  Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units."  These standards are commonly referred to as the "Refinery MACT II" standards and are found at 40 C.F.R. Part 63, Subpart UUU, §§ 63.1560–1579 and associated Tables.

70.     The affected sources that Subpart UUU applies to are process vents or groups of process vents on catalytic reforming units or catalytic cracking units that are associated with the regeneration of the catalyst used in the unit, process vents or groups of process vents on sulfur recovery plant units or the tail gas treatment units serving sulfur recovery plants that are associated with sulfur recovery, and bypass lines serving catalytic cracking units, catalytic reforming units, and sulfur recovery units, if the unit is located at a petroleum refinery that is a major source of HAP emissions.  40 C.F.R. §§ 63.1561(a) and 63.1562(b).

71.     Under Subpart UUU, owners or operators of process vents on affected sources have two compliance options for controlling emissions, one of which requires venting emissions to a flare that meets the control device requirements of 40 C.F.R. § 63.11(b).  40 C.F.R. § 63.1566(a)(1)(i).

72.     Under Subpart UUU, owners or operators of affected sources are required to submit certain reports.  40 C.F.R. § 63.1575(a).

73.     Subpart UUU requires that, for each deviation from an emission limitation that occurs at an affected source when a CEMS is not used to comply with the emission limitation, the compliance report must contain the total operating time of each affected source during the reporting period and information on the number, duration, and cause for monitor downtime incidents (including unknown cause, if applicable, other than downtime associated with zero and span and other daily calibration checks). 40 C.F.R. § 63.1575(d).

74.     Subpart UUU requires that, for each deviation from an emission limitation which occurs at an affected source using a CEMS to comply with the emission limitation, the compliance report must contain specific information on the CEMS operation, including: the date and time that each CEMS was inoperative or out-of-control; the date and time each deviation and malfunction started and stopped; the total duration of deviation during the reporting period, including the total duration of deviation as a percent of total source operating time; a breakdown of the total duration of deviations into those due to startup, shutdown, control equipment problems, process problems, other known causes, or other unknown causes; a summary of the total downtime for the CEMS and the total duration of downtime as a percent of total operating time; a breakdown of the total duration of downtime for the CEMS into periods due to monitoring equipment malfunctions, non-monitoring equipment malfunctions, quality

assurance/quality control calibrations, other known causes, and other unknown causes; an identification of each HAP monitored at the source; a brief description of the process units; the monitoring equipment manufacturer(s) and model number(s); the date of the latest certification audit for the CEMS; and a description of any change in the CEMS, processes or controls since the previous reporting period. 40 C.F.R. § 63.1575(e).

75.     Subpart UUU requires that each compliance report must include a copy of any performance test done during the reporting period on any affected unit. 40 C.F.R. § 63.1575(f).

76.     Pursuant to Table 44 of Subpart UUU, owners and operators of affected facilities under Subpart UUU are required to comply with 40 C.F.R. §§ 63.6(e)(1) and 63.11(b).

**C.     TITLE V**

77.     Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for certain sources, including major sources, sources subject to Sections 111 (NSPS program) or 112 (NESHAP/MACT program) of the CAA, or any source required to have a PSD or Nonattainment NSR Permit.  42 U.S.C. § 7661a(a).  The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including SIP requirements, are collected in one permit.  42 U.S.C. § 7661c(a).

78.      Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

79.     Ohio has an EPA-approved Title V program.  60 Fed. Reg. 42045 (August 15, 1995).  Ohio's Title V Permit program requirements are codified at Ohio Administrative Code 3745-77.  Ohio is authorized to issue and enforce Title V permits.  In all respects relevant to this

Complaint, the Title V regulations of Ohio closely mirror the federal Title V regulations codified at 40 C.F.R. Part 70.

80.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a)) and the Title V permit program and regulations of Ohio provide that, after the effective date of the state Title V permit program, no person may violate any requirement of a Title V permit.

81.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a)), the implementing regulations at 40 C.F.R. §§ 70.1(b) and 70.7(b), and the Title V permit program and regulations of Illinois provide that, after the effective date of the state Title V permit program, no source subject to Title V may operate except in compliance with a Title V permit.

82.     Section 503(c) of the CAA (42 U.S.C. § 7661b(c)), the implementing regulations at 40 C.F.R. § 70.5(a), and the Title V permit program and regulations of Ohio provide that each owner and operator of a source subject to Title V permitting requirements must submit a permit application.  Among other things, the permit application must contain:  (i) information sufficient to determine all applicable air pollution control requirements (including any requirement to comply with the applicable NSPS and/or NESHAP/MACT standards), 40 C.F.R. § 70.5(c)(4); (ii) information that may be necessary to determine the applicability of other applicable requirements of the CAA, 40 C.F.R. § 70.5(c)(5); (iii) a compliance plan for all applicable requirements for which the source is not in compliance, 42 U.S.C. § 7661b(b), 40 C.F.R. § 70.5(c)(8); and (iv) a certification of compliance with all applicable requirements by a responsible official.  40 C.F.R. § 70.5(c)(9).

83.     Under 40 C.F.R. § 70.5(b) and the Title V permit program and regulations of Ohio, any applicant who fails to submit any relevant facts or who has submitted incorrect

information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

84.     Section 504(a) of the CAA (42 U.S.C. § 7661c(a)), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Title V permit programs and regulations of Ohio requires each Title V permit to include, *inter alia*, enforceable emission limitations and standards, a schedule of compliance, and such other conditions as are necessary to assure compliance with all applicable requirements of the CAA, including the requirements of the applicable SIP.

85.     All terms and conditions of a Title V permit are enforceable by EPA.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

**D.     ENFORCEMENT OF THE CAA**

86.     Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of a SIP, the NSPS program, the NESHAP/MACT program, the Title V permit program, or a Title V permit.

87.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

88.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.

89.     The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq*., as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq*., as amended by the Federal Civil Penalties Inflation Adjustment Act Improvement Act of 2015, 28 U.S.C. § 2461 note, Pub. L. 114-74, requires EPA to periodically adjust its civil penalties for inflation.

Pursuant to those statutory mandates, EPA has adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA. Of relevance to this Complaint, for each violation that occurred between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be assessed; for each violation that occurred between January 13, 2009, and November 2, 2015, inclusive, penalties of up to $37,500 per day may be assessed; and for each violation that occurs after November 2, 2015, where penalties are assessed on and after January 15, 2018, penalties of up to $97,229 per day may be assessed. 40 C.F.R. § 19.4.

## CLEAN AIR ACT CLAIMS: 1–5

### General Allegations

90.     TRC is the "owner or operator," within the meaning of the CAA, of the Toledo Refinery.

91.     The Toledo Refinery is a "major emitting facility," a "source," a "stationary source," a "major stationary source," and a "major source" within the meaning of the CAA, the NSPS program and regulations, the NESHAP/MACT program and regulations, the Title V program and regulations, and the Ohio SIP that adopts, incorporates, and/or implements these programs and regulations.

92.     The Toledo Refinery has a Title V permit that has been issued by the State of Ohio.

93.     TRC owns and operates a catalytic cracking unit, two catalytic reforming units, two sulfur recovery units, and two flares known as the Plant 4 Flare (P009) and the Plant 9 Flare (P008) ("Flares").

94.     A flare is a combustion device that uses an uncontrolled volume of ambient air to burn gases.

95.     A steam-assisted flare is a flare that utilizes steam piped to the flare tip to assist in combustion.

## CLAIM 1
### Violation of NSPS and NESHAP/MACT Subpart A Requirement related to Flares; Violation of Title V Permit Provisions that Implement and Enforce these Requirements

### Failure to Operate Two Flares in a Manner Consistent with <u>Good Air Pollution Control Practices</u>

96.     Plaintiff realleges and incorporates by reference Paragraphs 1– 95 as if fully set forth herein.

97.     TRC is the owner and operator of Two Flares as identified in Paragraph 93.  Each of TRC's Two Flares is an "affected facility" within the meaning of 40 C.F.R. §§ 60.2, 60.100(a), and 60.100a(1), and therefore is or was subject to: (i) the General Provisions of the NSPS found at Subpart A; (ii) NSPS Subpart J (40 C.F.R. §§ 60.100–109) and Subpart Ja (40 C.F.R. §§ 60.100a–109a); and (iii) the requirements in the Toledo Refinery's Title V permit that compel compliance with the NSPS Subparts A and J.

98.     Each of TRC's Two Flares is also used as a control device for compliance with 40 C.F.R. Part 63, Subpart CC.  Under Subpart CC, these Two Flares are subject to certain general provisions of Part 63 found at Subpart A, including § 63.6(e)(1)(i).

99.     Each of TRC's Two Flares is also used as a control device for compliance with C.F.R. Part 63, Subpart UUU.  Under Subpart UUU, these Two Flares are subject to certain general provisions of Part 63 found at Subpart A, including § 63.6(e)(1)(i).

100.     Under 40 C.F.R. § 60.11(d) (found in Subpart A of Part 60) and 40 C.F.R. § 63.6(e)(1)(i) (found in Subpart A of Part 63), TRC was and is required, at all times, including

periods of startup, shutdown, and malfunction, to the extent practicable, to maintain and operate its Two Flares in a manner consistent with good air pollution control practice for minimizing emissions.

101.    Good air pollution control practices for minimizing emissions at flares involve, *inter alia*, combusting essentially all molecules of hydrogen sulfide, hydrocarbons, and hazardous air pollutants ("HAPs") in the gases sent to the flares by ensuring that they have sufficient heating value and oxygen to allow for complete combustion.  For steam-assisted flares, good air pollution control practices for minimizing emissions also involve, *inter alia*, injecting steam at a rate that maximizes flame stability and flare combustion efficiency.  For air-assisted flares, good air pollution control practices for minimizing emissions also involve adjusting the rate of introduction of air that is assisting combustion ("Assist Air") based on Vent Gas flow.

102.    In order to ensure that the gases sent to flares have sufficient heating value to ensure complete combustion, good air pollution control practices for minimizing emissions at flares involve, *inter alia*, monitoring, measuring, and/or calculating the net heating value ("NHV") of the gases in the combustion zone ("Combustion Zone Gas") of a flare.  In addition, supplemental gas must be immediately available for addition to the gas being sent to the flare (the "Vent Gas") to ensure that the NHV of the Combustion Zone Gas is maintained at a level that ensures adequate flare combustion efficiency.

103.    Good air pollution control practices for minimizing emissions at steam-assisted flares involve, *inter alia*, monitoring the Vent Gas flow rate and steam flow rate to the flare, calculating the ratio of the Vent Gas flow rate to the steam flow rate ("S/VG"), and having sufficient controls on the steam flow rate to enable increasing or decreasing it in order to optimize S/VG to minimize emissions.

104.     Good air pollution control practices for minimizing emissions at air-assisted flares involve, *inter alia*, monitoring the Vent Gas flow rate and the Assist Air flow rate to the flare and having sufficient controls on the Assist Air flow rate to enable increasing or decreasing it in order to optimize combustion efficiency.

105.     On numerous occasions from at least March 1, 2011, through March 24, 2013, TRC operated one or both of its Two Steam-Assisted Flares with an excessively high S/VG. This excessively high S/VG increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.  On information and belief, these failures continued past March 2013.

106.     On numerous occasions from at least March 1, 2011 through March 24, 2013, TRC operated one or both of its Two Flares without sufficient Net Heating Value in the Combustion Zone Gas.  This insufficient NHV reduced flare combustion efficiency and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.  On information and belief, these failures continued past March 2013.

107.     From at least March 1, 2011 through March 24, 2013, TRC failed to install, or failed to utilize properly, Vent Gas flow monitors and steam flow monitors on one or both of its Two Flares; failed to calculate S/VG at one or both of its Two Flares; and failed to have sufficient controls on steam flow to maintain an S/VG that minimized emissions at one or both of its Two Flares.  On information and belief, these failures continued past March 2013.

108.     From at least March 1, 2011 through March 24, 2013, TRC failed to have, or failed to utilize, any equipment or monitoring system on one or both of its Two Flares to enable

TRC to calculate the NHV in the Combustion Zone Gas of its Two Flares. In addition, TRC failed to have supplemental gas immediately available for addition to the Vent Gas. On information and belief, these failures continued past March 2013.

109. TRC's operation of one or both of its Two Flares with an insufficient NHV in the Combustion Zone Gas, without monitoring the NHV in the Combustion Zone Gas, without supplemental gas immediately available, with excessively high Steam-to-Vent-Gas ratios, without any (or without sufficient) monitors to measure and calculate S/VG, and without sufficient controls on its steam to optimize the steam injection rate, violated the requirement to operate one or both of the Two Flares in a manner consistent with good air pollution control practices for minimizing emissions.

110. The acts and omissions identified in this Claim constitute violations of:

(a) Sections 111 and 112 of the CAA, 42 U.S.C. §§ 7411, 7412;

(b) Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.11(d) and 63.6(e)(1)(i) (good air pollution control practices requirement in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(c) Section 112's implementing regulations at Table 6 of Subpart CC of Part 63 of Title 40 of the Code of Federal Regulations, insofar as that Table relates to flares and requires compliance with 40 C.F.R. § 63.6(e)(1)(i);

(d) Section 112's implementing regulations at Table 44 of Subpart UUU of Part 63 of Title 40 of the Code of Federal Regulations, insofar as that Table relates to flares and requires compliance with 40 C.F.R. § 63.6(e)(1)(i);

(e) Those provisions of Toledo Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs 110(a)–(d);

(f) The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(g) The OEPA provisions that implement and enforce any of the federal provisions cited in Subparagraphs (a)–(f).

111. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

112. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, TRC is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $97,229 per day for each violation after November 2, 2015.

## CLAIM 2
**Violation of an NSPS and NESHAP/MACT Subpart A Requirement related to Flares; Violation of Title V Permit Provisions that Implement and Enforce these Requirements**

**Failure to Monitor Two Flares to Ensure that They Are Operated and Maintained in Conformance with their Design**

113. Plaintiff realleges and incorporates by reference Paragraphs 1–112, as if fully set forth herein.

114. Each of TRC's Two Flares is subject to the requirements of 40 C.F.R. §§ 60.18(d) and 63.11(b)(1). Under these provisions, TRC was and is required to monitor each flare to ensure that it is operated and maintained in conformance with its design. Flares are designed, in part, to achieve high combustion efficiency of VOCs.

115. As part of its design, a steam-assisted flare must be operated within a range of Steam-to-Vent-Gas ratios that, on the one hand, avoids smoking through an insufficient S/VG, and, on the other hand, avoids excessive S/VG. Both insufficient and excessive S/VG reduce VOC combustion efficiency below a flare's designed efficiency.

116. In order to operate a steam-assisted flare in conformance with its design, the Vent Gas flow to the flare must be monitored; the steam flow to the flare must be monitored; the ratio of the Vent Gas flow to steam flow must be calculated; and the steam flow must be subject to

sufficient control to enable increasing or decreasing it in order to maintain a design-appropriate S/VG and a high VOC combustion efficiency consistent with design parameters.

117.    From at least March 1, 2011 through March 24, 2013, for one or both of the Two Flares, TRC failed to install and/or properly operate Vent Gas flow monitors and steam flow monitors; failed to calculate Steam-to-Vent-Gas ratios; and failed to have sufficient controls on steam flow to maintain Steam-to-Vent-Gas ratios within design parameters. On information and belief, these failures continued past March 2013 at one or both of the Flares.

118.    The acts and omissions identified in this Claim constitute violations of:

(a)    Sections 111 and 112 of the CAA (42 U.S.C. §§ 7411, 7412);

(b)    Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(d), 63.11(b)(1);

(c)    Section 111's implementing regulations at 40 C.F.R. §§ 60.592(a), 60.592a(a), 60.482-10(d), 60.482-10a(d), 60.482-10(e), and 60.482-10a(e) (relevant provisions of NSPS's Subparts GGG, GGGa, VV and VVa) insofar as they relate to flares and require compliance with 40 C.F.R. § 60.18(d);

(d)    Section 112's implementing regulations at 40 C.F.R. §§ 63.643(a)(1), 63.648(a), and 63.1566(a)(1)(i) (relevant provisions of NESHAP/MACT's Subparts CC and UUU) insofar as they relate to flares and require compliance with 40 C.F.R. § 63.11(b)(1);

(e)    Those provisions of Toledo Refinery's Title V Permit that requires compliance with the statutory and regulatory requirements identified in Subparagraphs (a)–(d);

(f)    The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(g)    The OEPA provisions that implement and enforce any of the federal provisions cited in Subparagraphs (a)–(f).

119.    Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

120.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, TRC is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $97,229 per day for each violation after November 2, 2015.

**CLAIM 3**
**Violation of the Benzene Waste Operations NESHAP (40 C.F.R. Part 61, Subpart FF);**
**Violation of Title V Permit Provisions that Implement and Enforce these Requirements**

**Failure to Comply with Various Provisions of 40 C.F.R. Part 61, Subpart FF**

121.     Plaintiff realleges and incorporates by reference Paragraphs 1–120 as if fully set forth herein.

122.     The Toledo Refinery is a "petroleum refinery" within the meaning of the Benzene Waste Operations NESHAP ("BWON").  40 C.F.R. § 61.341.  TRC is therefore subject to the BWON.  40 C.F.R. § 61.340(a).

123.     TRC has elected to comply with the BWON by means of the option found at 40 C.F.R. § 61.342(c)(3)(ii) (the "2 Mg Option").

124.     Pursuant to 40 C.F.R. § 61.342(c)(3)(ii), the benzene quantity for uncontrolled benzene-containing wastes must be less than or equal to 2 Mg per year.

125.     At the Toledo Refinery in 2014, the total annual benzene quantity for all streams chosen for exemption pursuant to 40 C.F.R. § 61.642(c)(3)(ii) was 4.42 Mg.

126.     In 2014, the Toledo Refinery had an uncontrolled benzene quantity in excess of the 2 Mg Option, in violation of 40 C.F.R. § 61.642(c) and 40 C.F.R. § 61.05(c).

127.     The acts and omissions identified in this Claim also constitute violations of: *(i)* those provisions of the Toledo Refinery's Title V permit that require compliance with the

BWON provision identified in this Claim; *(ii)* the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and *(iii)* the provisions found in the federally enforceable Ohio Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

128.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), the Civil Penalties Inflation Act of 1990, as amended, TRC is subject to mitigation of the effects of excess emissions and civil penalties of up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009 and up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015.

**CLAIM 4**
**Violation of NSPS Subparts VV, VVa, GGG and GGGa Requirements Related to Equipment Leaks;**
**Violation of Title V Permit Provisions that Implement and Enforce these Requirements**

**<u>Failure to Comply with Specified Equipment Leak Requirements</u>**

129.    Plaintiff realleges and incorporates by reference Paragraphs 1–128, as if fully set forth herein.

130.    At all times relevant to this Complaint, TRC has owned and operated process units at the Toledo Refinery that are subject to the NSPS for Equipment Leaks of VOC in Petroleum Refineries found at Subparts GGG and GGGa of 40 C.F.R. Part 60.  40 C.F.R. §§ 60.590–60.593 (GGG); 40 C.F.R. §§ 60.590a–60.593a (GGGa).

131.    In relevant part, Subpart GGG and GGGa require facilities that are subject to Subpart GGG and GGGa to comply with 40 C.F.R. Part 60, Subparts VV and VVa.  40 C.F.R. §§ 60.592; 60.592a.  Subpart VV is found at 40 C.F.R. §§ 60.480–60.489 and Subpart VVa is found at 40 C.F.R. §§ 60.480a–60.489a.

132.    On numerous occasions on and before September 2016, TRC failed to perform Method 21 correctly, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulations at 40 C.F.R. §§ 60.485(b)(1), 60.485a(b)(1), and Section 8.3.1 of Method 21 of Appendix A-7 of 40 C.F.R. Part 60.

133.    On numerous occasions on and before July 2012, TRC failed to monitor insulated components in accordance with Method 21, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulations at 40 C.F.R. §§ 60.485(b)(1), 60.485a(b)(1), and Section 8.3.1 of Method 21 of Appendix A-7 of 40 C.F.R. Part 60.

134.    On numerous occasions on and before September 2016, TRC failed to seal all open-ended lines using a cap, blind flange, plug, or second valve, in violation of 40 C.F.R. § 60.482-6(a)(2).

135.    On numerous occasions on and before July 2012, TRC failed to operate each open-ended valve or line equipped with a second valve in a manner such that the valve on the process fluid end is closed before the second valve is closed, in violation of 40 C.F.R. § 60.482-6(b).

136.    By failing to comply with the requirements of NSPS Subparts VV, VVa, GGG and GGGa, TRC also violated Section 111(e) of the CAA.

137.    On numerous occasions on and before September 2016, TRC failed to include pieces of equipment in its LDAR program; failed to record the identification numbers of these pieces of equipment; and failed to periodically monitor these pieces of equipment, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulations at 40 C.F.R. §§ 60.486(e)(1); 60.482-7(a)(1); 60.482-2(a)(1); 60.486a(e)(1); 60.482-7a(a)(1); and 60.482-2a(a)(1).

138.     The acts and omissions identified in this Claim also constitute violations of:
*(i)* those provisions of the Toledo Refinery's Title V permit that require compliance with the
NSPS provisions identified in this Claim; *(ii)* the prohibitions against violating the terms of a
Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and *(iii)* the
provisions found in the federally enforceable Ohio Title V program that correspond to the
prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

139.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA,
42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990,  TRC is subject to injunctive
relief, mitigation of the effects of excess emissions, and civil penalties of up to $32,500 per day
for each violation between March 16, 2004, and January 12, 2009; up to $37,500 per day for
each violation between January 12, 2009, and November 2, 2015; and up to $97,229 per day for
each violation after November 2, 2015.

### CLAIM 5
### Violation of NESHAP Subpart UUU Requirements Related to Reporting

#### Failure to Timely Submit Required Reports

140.     Plaintiff realleges and incorporates by reference Paragraphs 1–139, as if fully set
forth herein.

141.     At all times relevant to this Complaint, TRC has owned and operated a catalytic
cracking unit, two catalytic reforming units, and two sulfur recovery units at the Toledo Refinery
that are subject to 40 C.F.R. Part 63, Subpart UUU.

142.     In relevant part, Subpart UUU requires facilities subject to this Subpart to submit
semi-annual compliance reports that include all of the information required by 40 C.F.R.
§ 63.1575(d)-(f).

143.     TRC submitted semi-annual compliance reports for Subpart UUU on January 29, 2008, July 30, 2008, January 30, 2009, July 27, 2009, January 26, 2010, April 15, 2010, July 26, 2010, January 24, 2011, July 8, 2011, January 23, 2012, July 20, 2012, January 25, 2013, and July 25, 2013.

144.     TRC failed to include all of the information required by 40 C.F.R. § 63.1575(d)-(f) in each of its semi-annual reports, in violation of 40 C.F.R. § 63.1575(d)-(f).

145.     By failing to comply with the requirements of NESHAP Subpart UUU, TRC also violated Section 112(e) of the CAA.

146.     The acts and omissions identified in this Claim also constitute violations of: *(i)* those provisions of the Toledo Refinery's Title V permit that require compliance with the NESHAP provisions identified in this Claim; *(ii)* the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and *(iii)* the provisions found in the federally enforceable Ohio Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

147.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, TRC is subject to civil penalties of up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015.

## PRAYER FOR RELIEF

WHEREFORE, based upon the allegations in Paragraphs 1–147 of this Complaint, and pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Plaintiff requests that this Court:

1.      Permanently enjoin TRC from operating the Toledo Refinery except in accordance with the CAA and all applicable federal regulations and applicable federally enforceable state regulations;

2.      Order TRC to operate the Toledo Refinery in compliance with the CAA statutory and regulatory requirements set forth herein, the applicable SIP requirements, and Title V permit requirements applicable to the Toledo Refinery;

3.      Order TRC to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA alleged herein;

4.      Assess a civil penalty against TRC of up to $32,500 for each violation of the CAA occurring between March 16, 2004, and January 12, 2009; up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $97,229 per day for each violation after November 2, 2015.

5.      Award Plaintiff its costs of this action; and

6.      Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

UNITED STATES OF AMERICA


JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

_s/Arnold S. Rosenthal_____
ARNOLD S. ROSENTHAL
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-3446
(202) 616-6584 (fax)
arnold.rosenthal@usdoj.gov


JUSTIN E. HERDMAN
UNITED STATES ATTORNEY

_s/ Guillermo J. Rojas_____
GUILLERMO J. ROJAS (0069882)
Assistant United States Attorney
Four Seagate, Suite 308
Toledo, OH 43604-2624
Phone:  419-259-6376; Fax: 419-259-6360
Guillermo.Rojas@usdoj.gov


OF COUNSEL:

WILLIAM WAGNER
MARY McAULIFFE
Associate Regional Counsels
U.S. EPA Region 5
77 W. Jackson Blvd.
Chicago, IL  60604

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 30th day of January, 2019, a copy of the foregoing Complaint was filed electronically.  Notice of this filing will be sent via electronic mail to counsel for Toledo Refining Company, as follows:

Bart E. Cassidy
Manko, Gold, Katcher & Fox, LLP
401 City Avenue, Suite 901
Bala Cynwyd, PA 19004
bcassidy@mankogold.com

<u>*s/Arnold S. Rosenthal*</u>
Arnold S. Rosenthal

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Arnold S. Rosenthal
U.S. Department of Justice, P.O. Box 7611, Washington, D.C. 20044
202-514-3446

## DEFENDANTS

Toledo Refining Company

County of Residence of First Listed Defendant    Lucas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Bart Cassidy
Manko, Gold, Katcher & Fox, LLP
401 City Avenue, Suite 901, Bala Cynwyd, PA 19004

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b)
Brief description of cause:
Civil penalties and injunctive relief at a petroleum refinery for alleged violations of the Clean Air Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____
DOCKET NUMBER _____

DATE
01/30/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**      Civil Categories: (Please check one category only).

    1. [✓]   General Civil
    2. [ ]   Administrative Review/Social Security
    3. [ ]   Habeas Corpus Death Penalty

*If under Title 28, §2255, name the SENTENCING JUDGE: _____

                                  CASE NUMBER: _____

**II.**     **RELATED OR REFILED CASES**. See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled. Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

This action: [ ] is RELATED to another PENDING civil case [ ] is a REFILED case [ ] was PREVIOUSLY REMANDED

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**    In accordance with Local Civil Rule 3.8, actions involving counties in the Eastern Division shall be filed at any of the divisional offices therein. Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER. UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

(1)     **Resident defendant**. If the defendant resides in a county within this district, please set forth the name of such county

**COUNTY:**  Lucas

Corporation **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

(2)     **Non-Resident defendant**. If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.

**COUNTY:**

(3)     **Other Cases**. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.

**COUNTY:**

**IV.**     The Counties in the Northern District of Ohio are divided into divisions as shown below. After the county is determined in Section III, please check the appropriate division.

**EASTERN DIVISION**

[ ]   **AKRON**         (Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)
[ ]   **CLEVELAND**     (Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake,
                         Lorain, Medina and Richland)
[ ]   **YOUNGSTOWN**    (Counties: Columbiana, Mahoning and Trumbull)

**WESTERN DIVISION**

[✓]   **TOLEDO**        (Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,
                         Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca
                         VanWert, Williams, Wood and Wyandot)